## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CATHERINE E. WITMER,

      Plaintiff,

    v.

POST 245, INC.

      Defendant.

No. 4:19-CV-00565

(Judge Brann)

## MEMORANDUM OPINION

### JUNE 25, 2020

## I.    BACKGROUND

Plaintiff Catherine E. Witmer moves for partial summary judgment on her Title VII and Pennsylvania Human Relations Act retaliation claims.[1]  The Court denies Witmer's motion.

## II.    DISCUSSION

### A.    Standard of Review

I begin my analysis with the standard of review which undergirds summary judgment.  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose."[2]  Summary judgment is appropriate where "the movant shows that there is no

---

[1]    *See* Doc. 1 at ¶¶ 23-31; Doc. 17.
[2]    *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[3]  "Facts that could alter the outcome are 'material facts,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[4]  "A defendant meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[5]  "A plaintiff, on the other hand, must point to admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable substantive law."[6]

"The inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."[7]  Thus, "if the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."[8] "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably

---

[3]   Fed. R. Civ. P. 56(a).
[4]   *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993) (Hutchinson, J.) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) and *Celotex*, 477 U.S. at 322).
[5]   *Clark*, 9 F.3d at 326.
[6]   *Id.*
[7]   *Liberty Lobby, Inc.*, 477 U.S. at 252.
[8]   *Id.*

find for the plaintiff."[9]  "The judge's inquiry, therefore, unavoidably asks . . .
'whether there is [evidence] upon which a jury can properly proceed to find a
verdict for the party producing it, upon whom the onus of proof is imposed.'"[10]
The evidentiary record at trial, by rule, will typically never surpass that which was
compiled during the course of discovery.

      "A party seeking summary judgment always bears the initial responsibility
of informing the district court of the basis for its motion, and identifying those
portions of the pleadings, depositions, answers to interrogatories, and admissions
on file, together with the affidavits, if any, which it believes demonstrate the
absence of a genuine issue of material fact."[11]  "Regardless of whether the moving
party accompanies its summary judgment motion with affidavits, the motion may,
and should, be granted so long as whatever is before the district court demonstrates
that the standard for the entry of summary judgment, as set forth in Rule 56(c), is
satisfied."[12]

      Where the movant properly supports his motion, the nonmoving party, to
avoid summary judgment, must answer by setting forth "genuine factual issues that
properly can be resolved only by a finder of fact because they may reasonably be
resolved in favor of either party."[13]  For movants and nonmovants alike, the

---

[9]  *Id.*
[10]  *Id.* (*quoting Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 447 (1871)).
[11]  *Celotex*, 477 U.S. at 323 (internal quotations omitted).
[12]  *Id.*
[13]  *Liberty Lobby*, 477 U.S. at 250.

assertion "that a fact cannot be or is genuinely disputed" must be supported by: (i) "citing to particular parts of materials in the record" that go beyond "mere allegations"; (ii) "showing that the materials cited do not establish the absence or presence of a genuine dispute"; or (iii) "showing . . . that an adverse party cannot produce admissible evidence to support the fact."[14]

"When opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"[15]  In keeping, conclusory, self-serving affidavits do not withstand a motion for summary judgment.  But an affiant may create a worthy obstacle to summary judgment if they "set forth specific facts that reveal a genuine issue of material facts."[16]  Moreover, "if a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."[17]  On a motion for summary judgment, "the court need consider only the cited materials, but it may consider other materials in the record."[18]

Finally, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine

---

[14]   Fed. R. Civ. P. 56(c)(1).
[15]   *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2003) (Weis, J.).
[16]   *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009).
[17]   Fed. R. Civ. P. 56(e)(2).
[18]   Fed. R. Civ. P. 56(c)(3).

whether there is a genuine issue for trial."[19]  "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[20]  "If the evidence is merely colorable . . . or is not significantly probative, summary judgment may be granted."[21]

### B.    Undisputed Facts

### 1.    Background Information

Defendant Post 245, Inc. is part of a national veteran's organization with branches in each state.[22]  Post 245 offers food, drink, and small games of chances for its members.[23]  Post 245 is only open for members.[24]

### a.    Post 245's Board of Directors

Post 245 is governed by a Board of Directors.[25]  During the relevant period, Post 245's Board was constituted as follows:[26]

- President – House Committee: Dan Verdoorn

- Vice President – House Committee, Building & Grounds: Jim DeWolfe

- Treasurer – Special Events: Larry Hess

- Secretary – Membership: Rich Seifert

- Membership: Carl Lauck

---

[19]  *Liberty Lobby*, 477 U.S. at 249.
[20]  *Id.*
[21]  *Id.* at 249-50 (internal citations omitted).
[22]  Doc. 17-1 at ¶ 1.
[23]  Doc. 17-1 at ¶ 2.
[24]  Doc. 17-1 at ¶ 3.
[25]  Doc. 17-1 at ¶ 4.
[26]  Doc. 17-1 at ¶ 5.

- Budget & Finance: Karen Reed and Thomas Hoy

- Building & Grounds: Don Hartzell

- Joey Williams (position listed as "TBA")

The Board holds monthly meetings that include the review of budgets, expenditures, and revenues, as well as discussion of issues related to staff.[27]  Issues discussed during Board meetings are typically memorialized in writing.[28]

### 2.    Witmer's Employment with Post 245

Post 245 hired Witmer around 2011.  Her primary position was Bartender, but she also held the position of Event Planner.  Witmer's direct supervisor was Club Manager, Rebecca ("Becky") Dixon.

Post 245 maintained a daily log book that was kept behind the bar.  Servers used the log book to record any incidents or unusual activities.  The Board didn't review the log book – it was the Club Manager's responsibility to do so.[29]

### a.    Club Member Gary McManus

Gary McManus has been a Post 245 member since about 2007 or 2008.  His membership was active in 2016 (the time period relevant in this matter).  Since 2007 or 2008, McManus has visited Post 245 premises four to five times a week

---

[27]  Doc. 17-1 at ¶ 6.
[28]  Doc. 17-1 at ¶ 7.
[29]  Doc. 17-1 at ¶¶ 12-16.

during the fall, winter, and spring months.  McManus is on a first-name basis with

Post 245's bartenders, including Witmer.[30]

### b.     Witmer's Allegations Regarding Sexual Harassment

Witmer testified in her deposition that for about a year, McManus was

making comments she regarded as sexual harassment.[31]  Witmer testified that

McManus's comments included, but were not limited to, "I hope those big tits

don't get in the way," and "Is she wearing her big tit bra today."  Thomas Hoy

stated in a September 3, 2016 email that Witmer had told him that McManus had

"[made] inappropriate sexual comments (usually about her tits and ass)."[32]  In his

deposition, DeWolfe stated that, in his lay opinion, comments of the sort that

Witmer testified about would constitute sexual harassment.[33]

McManus, though, denies having ever made any sexual comments to

Witmer.[34]  McManus testified in his deposition that he had a "very good"

relationship with Witmer, that he never made sexual or inappropriate comments to

Witmer, that he never made comments about Witmer's body or physical

appearance and that he was never issued any kind of warning by the Board

---

[30]   Doc. 17-1 at ¶¶ 17-20.
[31]   Doc. 17-1 at ¶ 21.
[32]   Doc. 17-1 at ¶ 22.
[33]   Doc. 17-1 at ¶ 23.
[34]   Doc. 17-1 at ¶ 24.

concerning alleged sexual harassment.[35]  Per McManus, the only dispute he had

with Witmer concerned an issue over service at the bar.[36]

Further, Jack Porta, another member and patron of Post 245, has submitted a

declaration.[37]  Porta stated that he "was present at [Post 245] at various points

throughout 2016" and does "not have any specific recollection of Mr. McManus

ever making comments about her breasts or body to Ms. Witmer, or making any

kind of sexual or sexually harassing comments to Ms. Witmer.[38]  Porta recalled

two arguments between Witmer and McManus – one on July 21, 2016; the other

on September 1, 2016.  But in Porta's recollection, neither argument involved

McManus making sexual comments to Witmer or commenting on her

appearance.[39]

### c.   Witmer's General Reporting of the Perceived Sexual Harassment

Witmer testified that she verbally reported the above perceived sexual

harassment (that she testified about in her deposition) to Dixon.[40]  Witmer also

made notations about the perceived sexual harassment in the log book.  For

example, on July 21, 2016, Witmer wrote: "Gary McManus has been rude,

---

[35]   Doc. 17-2 Ex. H at 10-12.
[36]   Doc. 17-2 Ex. H at 13.
[37]   *See* Doc. 21 at 5-6.
[38]   Doc. 21 at 5, ¶¶ 5-6.
[39]   *See* Doc. 21 at 6, ¶¶ 7-10.
[40]   Doc. 17-1 at ¶ 25.

belittling, condiscending [sic], insulting [and] inappropriate on[] more than one occasion.  I will <u>NOT</u> serve Gary anything again."[41]

### d.    Witmer's September 1, 2016 Reporting

On September 1, 2016, Witmer reported to work as scheduled.[42]  During her shift that day, McManus arrived at Post 245.  This struck Witmer as "unusual" because, according to Witmer, "I was told by [Dixon] that he would not be coming in during my shifts."[43]  Witmer testified that after McManus came in, she told Dixon "that I would not serve him."  When Dixon said that Witmer would be serving McManus, Witmer asked if Dixon was crazy for telling her to "serve somebody who I've documented has sexually harassed me[.]"[44]  Dixon reiterated to Witmer that she had to serve McManus.[45]  Shortly after the aforementioned discussion with Dixon, Witmer convinced another employee to cover the remainder of her shift.  Witmer then left for the day.[46]

### e.    Witmer's September 2, 2016 Reporting

Witmer reported to work as scheduled on September 2, 2016.[47]  A few hours into her shift, Witmer approached Dixon – with the goal, according to Witmer, of "clarify[ing] exactly what my job requirements were.[48]  Witmer testified that

---

41  Doc. 17-1 at ¶ 26.
42  Doc. 17-1 at ¶ 27.
43  Doc. 17-1 at ¶ 28.
44  Doc. 17-1 at ¶ 29.
45  Doc. 17-1 at ¶ 30.
46  Doc. 17-1 at ¶ 31.
47  Doc. 17-1 at ¶ 32.
48  Doc. 17-1 at ¶ 33.

"[w]hen I went to her and told her I would not serve Mr. McManus, she told me I had to and I needed to get a thicker skin, because she had bartended for years and that's just what – it's just part of the job."  Witmer testified that Dixon indicated that Dixon "was told Gary McManus was a member in good standing and you will serve him."[49]  In a contemporaneous letter, Dixon wrote that "Witmer came to see me . . . to inform me that she would not serve [McManus].  He is a member in good standing with the club, no suspension that I am aware of.  I told he[r] it was her job to serve him.  She proceeded to make claims that she is sexually harassed by him and he is deme[a]ning to her.  These things I have not witnessed."[50]

Witmer again requested that another employee cover the remainder of her shift, and then left work for the day.[51]  Before leaving for the day, Witmer made the following note in the log book:[52]

> "Incident with Gary. Becky told me I <u>had</u> to serve him although she is aware that he has been insult [sic], demeaning and as [sic] made inappropriate sexual comments. I refuse to serve him. She said to [sic] bad he is a paid member. I was not able to perform my job due to being so upset. Becky reiterated to me that . . . it was confirmed that it was part of my job to serve demean [sic] insulting person who makes inappropriate sexual comments."

### 3.   Witmer's Termination from Employment

In the time between the September 2, 2016 incident and her next scheduled shift, Witmer spoke with DeWolfe.  During their discussion, DeWolfe advised

---

[49]   Doc. 17-1 at ¶ 34.
[50]   *Id.*
[51]   Doc. 47-1 at ¶ 35.
[52]   Doc. 47-1 at ¶ 36 (emphasis in original).

Witmer that according to Dixon, Witmer had been terminated from employment. In addition, DeWolfe advised Witmer that Dixon had sent a certified letter setting forth the basis for Witmer's termination from employment.[53]  In light of the discussion with DeWolfe, Witmer did not report for her next scheduled shift of September 8, 2016.[54]

On or about September 12, 2016, Witmer received the letter from Dixon. The following is a true and correct copy of the text of Dixon's letter.[55]  The Court has made slight proofreading edits.

> September 2, 2016
>
> This is concerning an incident that took place on September 1, 2016 at approximately 3:45 PM.
>
> Gary McManus came into the club to sign the book and have a drink.  Catherine Witmer came to see me in the beer cooler to inform me that she would not serve him.  He is a member in good standing with the club, no suspension that I am aware of.  I told her it was her job to serve him.  She proceeded to make claims that she is sexually harassed by him and he is demeaning to her.  These things I have not witnessed.  We have nicknamed Gary as Grumpy Gary because of his demeanor.
>
> Catherine went out to the bar and asked Gary if he was going to continue to be rude and demeaning to her and he just left. Catherine then came back in the kitchen continuing her rant at me about Gary loud enough for the entire bar to hear.  The bar quickly cleared out.
>
> This was totally unprofessional of Catherine, she is a bartender for the State College American Legion, her duties are to serve drinks,

---

[53]   Doc. 47-1 at ¶ 37.
[54]   Doc. 47-1 at ¶ 38.
[55]   Doc. 17-1 at ¶ 40.

sell SGOC tickets, serve food.  In the service industry you cannot pick and choose your customers.

She proceeded to walk out on her shift at 4:15 PM.

I came in today and I was going to talk to her about this after her shift and give her a 30-day suspension for her actions.  Catherine was angry at the bar about yesterday and wanted to speak immediately.  She wanted me to sign a paper stating that she is required to serve people who sexually harass her.  I refused and she left after threatening my employment.

Because of her actions on Sept. 1, 2016 and September 2, 2016, I see no other action but to terminate her employment at the State College American Legion.

Rebecca Dixon
Club Manager

When DeWolfe was deposed concerning the reason why Witmer was terminated, he stated he did not know "the specific reason, but it was along the lines of not following proper communication channels, something in that regard, and the manner" "in which she did it."  DeWolfe was not "aware of the specifics." DeWolfe stated, "I believe she brought up an incident with Mr. McManus to Ms. Dixon, and in doing so, was quite upset and expressive, to the point of expletives and yelling."  According to DeWolfe, Witmer brought up "an alleged sexual harassment incident," with her being sexually harassed by McManus, when she was being upset and expressive and using expletives.[56]

---

[56]   Doc. 17-1 at ¶ 41.

Dixon was the sole decisionmaker with respect to the decision to terminate Witmer's employment.[57]  Shortly after the incidents that transpired on September 1 and 2, 2016, Witmer sent an email to Thomas Hoy.  In that email, Witmer further explained her point of view on the relevant series of events.[58]  In response, several Post 245 board members exchanged emails discussing the subject matter of Witmer's termination and the reports of sexual harassment.[59]

Thomas Hoy sent the following email on September 6, 2016:[60]

> Fellow board members –
>
> For the record, this is not how the situation should have been handled.  The board should have been involved in the decision-making process on this one.  Did anyone notice that Gretchen Carlson got $20 million from FOX News today for sexual harassment?!?!  I smell a lawsuit coming our way and it's frustrating when the Board has no input into the matter.  Tom Hoy.

DeWolfe sent the following email (excerpted) to Thomas Hoy on September 7, 2016:[61]

> Tom – you're welcome.  I'll be there at 6 tonight.  Let's plan on meeting for no more than 30 to 40 minutes.  I also have a 7 PM commitment.
>
> First, sexual harassment must have zero tolerance irrespective of the environment.

---

[57] Doc. 17-1 at ¶ 42.  On September 4, 2016, Board member Hess sent an email to Thomas Hoy saying that Dixon "was told . . . to handle the situation as she [saw] fit," as Dixon was "the manager" and was "to handle this."  Doc. 17-1 at ¶ 43.

[58] Doc. 17-1 at ¶ 44.

[59] Doc. 17-1 at ¶ 45.

[60] Doc. 17-1 at ¶ 46.  The Court has made slight proofreading edits to this email and to the below two emails.

[61] Doc. 17-1 at ¶ 47.

Second, there is something about this story that is not adding up. We can discuss that later.

Third, this issue has made it clear we need a sexual harassment policy and training. I can help identify a resource. I researched this last night and it's not that complicated.

Karen Reed sent the following email to Thomas Hoy on September 7, 2016.

Italics indicate Witmer's words from her own email to Thomas Hoy.[62]

It appears that Katherine has a valid position and it is something that needs to be presented to and discussed at the next Board meeting.

It would appear that the actions of the Manager were inappropriate at best. I did not see anywhere that Catherine was informed that she was fired as she said she intends to go to work tomorrow with the caveat:

*If these are the new employment guidelines [to wit, "As I told Becky, it is not possible for me to perform my bartending responsibilities under the demands of management to accept harassment and inappropriate sexual comment"] that are supported and enforced by the [Post 245] management and [Board] I ask that it be clarified in writing before Wednesday Sept 7th at noon. If these are NOT the principles and values that are now being represented by [Post 245], I would [request] that clarified in writing along with the proposed resolution in this matter as well. I trust this matter will be addressed at the urgent level I feel it merits. This is necessary in order for me to be able to perform my job with no future conflict relating to this matter. Not only has this had an emotional and physical effect on me it is an extreme financial hardship.*

I copied from below as Katherine had presented an ultimatum, and since the Board did not do as she has requested, who knows if she will show up for work tomorrow?

---

[62] Doc. 17-1 at ¶ 48.

C. **Analysis**

The Court cannot hold as a matter of law that Witmer's conduct was a "protected activity" under Title VII.  As such, the Court cannot hold as a matter of law that Witmer has established a *prima facie* case of retaliation under Title VII.[63] This compels denial of summary judgment on Witmer's Title VII retaliation claim. This also dictates denial of summary judgment on Witmer's Pennsylvania Human Relations Act retaliation claim.[64]

"Whether the employee opposes, or participates in a proceeding against, the employer's activity, the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII."[65]  "In a classic 'he said, she said' situation, it is not this Court's role to determine who is and is not correct; who is and is not believable. Credibility is a determination for the factfinder to make, not this Court."[66]

This is one of those "classic" situations.  It's "she" – Witmer – against "he" (or, "they") – McManus and Porta.  Each side has presented deposition testimony (and an affidavit, from Porta).  Witmer has testified about what she saw as harassment; McManus and Porta have testified that this harassment did not occur.

[63] *See Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006), *as amended* (Sept. 13, 2006).

[64] It is well settled that "[t]he same standards, decisional law, and analysis apply to retaliation claims" under Title VII and under the Pennsylvania Human Relations Act.  *Yeager v. UPMC Horizon*, 698 F. Supp. 2d 523, 543 (W.D. Pa. 2010).

[65] *Moore*, 461 F.3d at 341.

[66] *Berezansky v. CNB Bank*, No. 3:17-CV-105, 2019 WL 4750326, at *7 (W.D. Pa. Sept. 30, 2019).

The jury should decide which side is more credible.  "After review, the Court cannot conclude that a reasonable jury would have to find that Plaintiff [did have] a good faith, objectively reasonable belief that [s]he was opposing a prohibited employment practice."[67]

## III.    CONCLUSION

Witmer's motion is denied.  An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge

---

[67] *Id.*; *see Thompson v. Tractor Supply Co.*, No. CIV.A. 10-234, 2011 WL 4433268, at *11 (W.D. Pa. Sept. 21, 2011); *Cragle v. Werner Enterprises, Inc.*, No. 3:07CV2132, 2010 WL 936774, at *10 (M.D. Pa. Mar. 11, 2010); *Hill v. Educ. Mgmt. Corp.*, No. CIV.A 08-900, 2009 WL 3286627, at *6 (W.D. Pa. Oct. 13, 2009); *see generally Fogleman v. Greater Hazleton Health All.*, 122 F. App'x 581, 584 (3d Cir. 2004).